**John E. TRYTKO, Jr., Plaintiff–Appellee, Cross–Appellant,**

v.

**HUBBELL, INC., Defendant–Appellant, Cross–Appellee.**

Nos. 93–1740, 93–1857.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1994.

Decided July 7, 1994.

Rehearing Denied Oct. 6, 1994.

Thomas J. Brunner, Jr. (argued), Paul J. Peralta, Kevin D. O'Rear, Baker & Daniels, South Bend, IN, John W. Purcell, Cynthia P. Purvis, Baker & Daniels, Indianapolis, IN, for plaintiff-appellee.

Thomas W. Yoder (argued), Karl J. Veracco (argued), Miller, Carson & Boxberger, Fort Wayne, IN, for defendant-appellant in No. 93–1740.

Thomas W. Yoder (argued), Karl J. Veracco (argued), Miller, Carson & Boxberger, Fort Wayne, IN, C. Erik Chickedantz, Hawk, Haynie, Gallmayer & Chickedantz, Fort Wayne, IN, for defendant-appellee in No. 93–1857.

Before COFFEY and FLAUM, Circuit Judges, and MORAN, Chief District Judge.*

FLAUM, Circuit Judge.

In this diversity case, John E. Trytko, Jr., a resident of Indiana, filed a three-count amended complaint against Hubbell, Inc., a Connecticut corporation. In Count I, Trytko alleged negligent misrepresentation on the part of Hubbell's then-general counsel, Richard Davies, with respect to the expiration dates of Hubbell stock options. In Counts II and III respectively, Trytko alleged constructive fraud and a violation of the Indiana Blue Sky laws, based upon the same facts underlying Count I. On the second day of trial, the district court granted judgment as a matter of law for Hubbell on Counts II and III while permitting Count I to be decided by the jury. The jury returned a verdict for Trytko in the amount of $629,300. Hubbell then filed post-trial motions for judgment notwithstanding the verdict and for a new trial, both of which the district court denied. Hubbell appeals the disposition of Count I with respect to both liability and damages. Trytko cross-appeals the entry of judgment as a matter of law on Count II. We affirm the judgment against Trytko on Count II and the jury verdict for Trytko on Count I, but we reduce the damage award by the option price of $95,000.

## I.

From September, 1976, to June 1, 1985, John Trytko served as president of Raco, Inc., a manufacturer of electrical devices located in South Bend, Indiana. In April, 1981, Hubbell acquired Raco and offered Hubbell stock options to certain Raco employees, including Trytko. Pursuant to its 1973 "Stock Option Plan for Key Employees" ("the Plan"), Hubbell granted the ten-year options in question here on December 8, 1981, December 14, 1982, and December 13, 1983. According to the Plan, retired employees could exercise option rights until the earlier of (a) the end of the specified option period, or (b) three years after the date of retirement. Each option permitted its holder to purchase a fixed number of Hubbell shares at a price set on the date the option was granted. Thus, the value of a given option could be determined by subtracting the option price from the prevailing market price.

Trytko decided to retire on June 1, 1985. A few months prior to the appointed date, on March 19, 1985, Trytko arranged a meeting at Hubbell headquarters in Orange, Connecticut, in order to discuss his retirement benefits with Hubbell officials. On that day, Trytko met with Roger Search, Hubbell's vice president of personnel, and Richard Davies, Hubbell's secretary and general counsel. Search provided Trytko with a written summary of his stock options, but instructed Trytko to direct any questions he may have to Davies, with whom he met later

* The Honorable James B. Moran, of the Northern District of Illinois, sitting by designation.

in the day. Trytko and Davies present contradictory accounts of what was said during their meeting. Trytko claims that Davies erroneously advised him that he would have the balance of the full ten-year term in which to exercise his stock options. According to Trytko, Davies stated that Trytko had "until the expiration date" to exercise the options. When Trytko responded "what you're saying is I have until 1991, 1992, and 1993"—the dates listed on Trytko's stock option record—Davies allegedly did not respond, changing the subject instead. Trytko then wrote "1991, 1992, and 1993" directly on the stock option document that he had received from Search. Davies, on the other hand, contends that he advised Trytko several times of the three year period during which retired employees must exercise their stock options. Davies maintains that Trytko understood the special retirement rule and asked no questions.

Although Trytko exercised the qualified (or "tax-favored") portions of his stock options within three months of his retirement, he made no effort to exercise his non-qualified stock option rights until over three years had passed since his retirement. On December 5, 1988, Trytko telephoned Davies to express his desire to exercise his remaining options. Davies informed Trytko that the unexercised options had expired on June 1, 1988. Trytko then advised Davies of the notes he had made during their 1985 meeting which indicated his understanding that the options had a ten-year term. Davies asked Trytko to provide a copy of the document. Extensive correspondence over the next several months between Trytko and Hubbell failed to resolve the dispute to Trytko's satisfaction. On May 31, 1990, Trytko filed suit.

The case went to trial on January 6, 1993. On the second day of trial, the district court granted judgment as a matter of law for Hubbell on Counts II and III of Trytko's amended complaint, alleging constructive fraud and a violation of Indiana's Blue Sky laws. The trial then proceeded on the sole remaining count—whether Davies negligently misrepresented the expiration dates of Trytko's stock options. Over Hubbell's continuing objections, Trytko's counsel examined

Davies at length, both on direct and cross-examination, concerning Hubbell's practice of sending notices to option holders notifying them of the expiration dates of their options. Davies' testimony revealed that Hubbell began the practice of sending reminder notices in January, 1988, five months before Trytko's options allegedly expired. Hubbell never sent such a notice to Trytko. Furthermore, also over Hubbell's objection, Trytko's counsel presented evidence of the then-current value of the stock Trytko would have acquired had he been permitted to exercise his stock options in a timely fashion. As of June 1, 1988, the 9,500 shares of Hubbell stock for which Trytko held options had a market value of $300,000, for which Trytko would have paid an option price of $95,000. By December 5, 1988, the value of the shares had increased to $320,000. In 1989, Hubbell began issuing stock dividends which, by the eve of trial, would have increased Trytko's proportional share of ownership to 11,547 shares, with a market value of $629,325.67.

After a four-day trial, the jury returned a verdict for Trytko on his negligent misrepresentation claim and awarded damages in the amount of $629,300. The district court denied Hubbell's post-trial motions for judgment notwithstanding the verdict and for a new trial. Hubbell appeals the jury verdict as to both liability and damages. Trytko cross-appeals the entry of judgment as a matter of law on his constructive fraud claim.

## II.

### A.

As a threshold matter, we address Hubbell's contention that it was entitled to judgment as a matter of law on Count I because Indiana does not recognize the tort of negligent misrepresentation. As a federal court hearing a case in its diversity jurisdiction, we must "determine the issues presented herein as we believe the Indiana courts would under the circumstances." *Kutsugeras v. Avco Corp.*, 973 F.2d 1341, 1346 (7th Cir.1992). In other words, we must apply Indiana law as declared by its supreme court, or in the absence of a statement by that court, by its intermediate appellate courts.

*See id.* (citing *Affiliated FM Insurance Co. v. Trane Co.,* 831 F.2d 153, 155 (7th Cir.1987)). Where, as here, the state supreme court has not addressed the subject at hand, directly or otherwise, and the state appellate courts have issued seemingly contradictory opinions, the task of finding the applicable state law is easier articulated than performed. In such circumstances, "a federal court must exhaustively dissect each piece of evidence thought to cast light on what the highest state court would ultimately decide." Dolores K. Sloviter, *A Federal Judge Views Diversity Jurisdiction through the Lens of Federalism,* 78 Va.L.Rev. 1671, 1676 (1992) (citation omitted) (quoting Judge Henry Friendly).

■ As Hubbell points out, earlier Indiana appellate decisions declined to recognize the new tort of negligent misrepresentation. *See Wilson v. Palmer,* 452 N.E.2d 426, 429 (Ind. App. 4th Dist.1983); *Essex v. Ryan,* 446 N.E.2d 368, 370 (Ind.App.2d Dist.1983); *English Coal Co., Inc. v. Durcholz,* 422 N.E.2d 302, 310 (Ind.App. 1st Dist.1981). However, in *Eby v. York Division, Borg–Warner,* 455 N.E.2d 623, 628–629 (Ind.App. 4th Dist.1983), the court, adopting the Restatement (Second) of Torts, § 552,[1] recognized the tort of negligent misrepresentation in the limited context of an employer-employee relationship. In *Eby,* the court reversed the grant of summary judgment for an employer who had negligently made false representations to an employee concerning future employment in another state. As the court noted,

> One of the major questions in negligence cases is naturally the duty to be attributed to the party making the representations

and to whom that duty extends. In this case there is the clear-cut principle that it is an employer's duty to protect its employee against the employer's own negligence. *See Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Gossett,* (1909) 172 Ind. 525, 87 N.E. 723; *Conway v. Park,* (1941) 108 Ind.App. 562, 31 N.E.2d 79. Although typically used in reference to physical injuries suffered in such master-servant relationships, we find no reason not to apply the general principle to economic injury as occurred here.

*Id.* at 629.

In a number of post-*Eby* decisions, the Indiana appellate courts have declined to recognize the tort of negligent misrepresentation outside the context of an employment relationship. *See Emmons v. Brown,* 600 N.E.2d 133, 135 (Ind.App.3d Dist.1992) ("Indiana has declined to recognize the tort of negligent misrepresentation in the context of rendering professional opinions."); *Pugh's IGA, Inc. v. Super Food Services, Inc.,* 531 N.E.2d 1194, 1199 n. 1 (Ind.App. 4th Dist. 1988) ("*Eby* is limited to its own facts and is not applicable in this instance. Indiana does not recognize the tort of negligent misrepresentation."); *United Leaseshares v. Citizens Bank & Trust Company,* 470 N.E.2d 1383, 1390 (Ind.App. 1st Dist.1984) ("Although negligent misrepresentation may not be a recognized theory of recovery, simple negligence is a recognized theory."). In yet another appellate decision, however, a panel of the Fourth Division recognized the continued vitality of *Eby,* though it declined to "extend the tort of negligent misrepresentation to include negligent professional advice." *Nicoll v. Commu-*

---

1. The primary elements of the tort of negligent misrepresentation are found in RESTATEMENT (SECOND) OF TORTS § 552 (1977), which limits liability to the following:

(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*nity State Bank,* 529 N.E.2d 386 (Ind.App. 4th Dist.1988).

We have considered the scope of Indiana's recognition of the tort of negligent misrepresentation once before in *Industrial Dredging & Engineering v. Southern Indiana Gas & Electric Co.,* 840 F.2d 523 (7th Cir.1988). In *Industrial Dredging,* we concluded that:

> Indiana courts have consistently refused to extend the tort of negligent misrepresentation beyond the employment context. We are reluctant to adopt a more expansive view of the tort than that adopted to date in Indiana.

*Id.* at 526. A number of federal district courts in Indiana also have considered the question we face today, both before and after *Industrial Dredging,* and they have by and large restated the narrow scope of the tort recognized by the state appellate courts. *See Guenin v. Sendra Corp.,* 700 F.Supp. 973, 977 (N.D.Ind.1988) ("The tort of negligent misrepresentation has received very limited acceptance in Indiana."); *Abdulrahim v. Gene B. Glick Co., Inc.,* 612 F.Supp. 256, 264 (N.D.Ind.1985) ("The *Eby* case convinces this court that such a tort [of negligent misrepresentation] can be a viable legal theory in cases arising out of statements made in the course of an employment relationship."); *RTC v. O'Bear, Overholser, Smith & Huffer,* 840 F.Supp. 1270, 1282 (N.D.Ind.1993) (noting that Indiana has declined to recognize the tort of negligent misrepresentation in the context of rendering professional opinions); *Smith v. Colgate–Palmolive Co.,* 752 F.Supp. 273, 278 (S.D.Ind.1990) ("Indiana does not recognize the tort of negligent misrepresentation."), *aff'd* 943 F.2d 764 (7th Cir.1991).

■ As the foregoing discussion indicates, courts have been divided as to whether Indiana recognizes the tort of negligent misrepresentation, and, if so, under what circumstances an action based upon that tort may be sustained. Our task is to create some semblance of order from this relative chaos. In our view, *Eby* remains to this day the most thorough treatment of the reasons for and against recognition of the tort of negligent misrepresentation. Since *Eby,* Indiana courts have declined to extend its rationale beyond the employment context, and, indeed,

a panel of the same division that issued *Eby* has limited it to its facts (though that panel offered no reasons for doing so). Nevertheless, *Eby* has not been overruled, either by the Indiana Supreme Court or by the appellate court for the fourth division. We conclude therefore that Indiana would continue to recognize the tort of negligent misrepresentation, but only in circumstances closely analogous to those present in *Eby.*

Here the facts are sufficiently similar to sustain Trytko's action. As in *Eby,* the issue in this case is simply whether an employer, through its agent, breached a duty to protect its employee against the employer's own negligence by making false representations upon which the employee relied to his detriment. *See* 455 N.E.2d at 629. Also, as in *Eby,* the "specter of confusing professional opinions (malpractice) with simple misrepresentations made in the course of one's professional activities," which would loom if the tort were applied to "professionals whose actual calling requires the giving of opinions," is not raised by holding employers potentially liable for the negligent misrepresentations made by their agents to their employees. *Id.* The district court properly allowed Count I of Trytko's amended complaint to be decided by the jury.

### B.

■ Hubbell contends that Trytko nonetheless has failed to demonstrate an entitlement to any damage award. We again should ascertain what the Indiana courts would do under the circumstances, but unfortunately have no guidance as to the proper measure of damages in a negligent misrepresentation action from any Indiana cases. In view of this dearth of relevant authority, we must draw upon published opinions from other jurisdictions, treatises, and restatements to determine how the Indiana Supreme Court would approach this issue.

Although the *Eby* court adopted § 552 of the Restatement (describing the elements of the tort of negligent misrepresentation), no Indiana court has discussed or adopted

§ 552B's view of damages.[2] Nevertheless, the Restatement, in its stature, seems an appropriate starting point for our discussion. Section 552B states:

(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is the legal cause, including

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

(b) the pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

(2) The damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

(1977 ed.) at 140. As the Commentary to § 552B makes clear, the Restatement adopts the "out-of-pocket" rule as the appropriate measure of damages for negligent misrepresentation and specifically excludes "benefit-of-the-bargain" damages. Comments a. and b. at 141.[3] Prosser and Keeton explain the critical distinction between these standards of measurement. The out-of-pocket rule "looks to the loss which the plaintiff has suffered in the transaction, and gives him the difference between the value of what he has parted with and the value of what he has received." Prosser and Keeton on Torts, 5th ed. § 110 at 767; *see also* Restatement of Torts (Second) §§ 549(1)(a) & 552B(1)(a); *W.K.T. Distributing Co. v. Sharp Electronics*, 746 F.2d 1333, 1337 (8th Cir.1984) (explaining that under the out-of-pocket rule, "[t]he loss is usually measured as the difference between what the plaintiff parted with and what the plaintiff received."); *Lewis v.*

*Citizens Agency of Madelia, Inc.*, 306 Minn. 194, 235 N.W.2d 831, 835 (1975) (explaining that the out-of-pocket rule does not raise "a question of what the plaintiff might have gained through the transaction but what was lost by reason of defendant's deception."). The Restatement alternatively describes out-of-pocket damages as "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation." §§ 549(1)(b) & 552B(1)(b). As the Commentary explains, Clause (b) applies "when a buyer, in reliance upon the misrepresentation, uses the subject matter of the sale in the belief that it is appropriate for a use for which it is harmfully inappropriate or when he has incurred expenses in preparation for a use of the article for which it would have been appropriate if the representation had been true." Rest. at 109. By contrast, the benefit-of-the-bargain rule "gives the plaintiff the benefit of what he was promised, and allows recovery of the difference between the actual value of what he has received and the value that it would have had if it had been as represented." Prosser and Keeton at 768. The Restatement adopts the former rule in cases involving an innocent misrepresentation and the latter where the misrepresentation was fraudulent. *See* Restatement §§ 549 & 552B.[4]

■ Related cases from other jurisdictions also focus on the distinction between "out of pocket" and "benefit of the contract" damages. As Hubbell points out, several courts have adopted the Restatement's position that a successful plaintiff in a negligent misrepresentation action may recover only out-of-pocket damages. *See e.g., Rosales v. AT & T Information Systems, Inc.*, 702 F.Supp. 1489, 1501 (D.Colo.1988); *First Interstate Bank of Gallup v. Foutz*, 107 N.M. 749, 752, 764 P.2d

---

2. While the plaintiffs in *Eby* only sought limited damages which might accurately be characterized as "out-of-pocket," the court made no mention whatsoever of the measure of damages. Accordingly, *Eby* itself imposes no limitation on the scope of damages recoverable for the tort of negligent misrepresentation.

3. The Commentary further explains the rationale for its proposed rule as follows: "The considerations of policy that have led the courts to compensate the plaintiff for the loss of his bargain in

order to make the deception of a deliberate defrauder unprofitable to him, do not apply when the defendant has had honest intentions but has merely failed to exercise reasonable care in what he says or does." Comment b. at 141.

4. Restatement § 549 (Damages for Fraudulent Misrepresentation) mirrors § 552B (Damages for Negligent Misrepresentation) in structure except for this divergence with respect to benefit-of-the-bargain damages.

1307, 1310 (1988); *Law Offices of L.J. Stockler v. Rose,* 174 Mich.App. 14, 436 N.W.2d 70, 85–86 (1989). Trytko relies heavily on *Gediman v. Anheuser Busch, Inc.,* 299 F.2d 537, 548 (2d Cir.1962) (Friendly, J.) and *Lewis v. Citizens Agency of Madelia, Inc.,* 306 Minn. 194, 235 N.W.2d 831, 835 (1975), both of which, he contends, stand for the proposition that the proper damage award in a negligent misrepresentation case places the plaintiff in the position he would have attained but for the misrepresentation. In *Gediman,* the plaintiff, confused over the range of benefits available under his employer's retirement plan, asked the employer which option would provide him with the most favorable treatment. The employer negligently informed plaintiff that a certain benefit package was optimal when, in reality, plaintiff would have been significantly better off under a different package. In an opinion authored by Judge Friendly, the court found liability under § 552 of the Restatement and awarded damages equal to the difference between the value of the benefit plaintiff would have selected and the value of the plan he did select. The Ninth Circuit has explained that the damage award in *Gediman*

> does not represent benefit-of-the-bargain damages, i.e., the difference between what the plaintiff *expected* he would receive, had the defendant's representations been true, and the amount *actually received* under that option. Instead, he was awarded the difference between the value parted with at the time of the misrepresentation, and the value of what he received in return.

*Cunha v. Ward Foods, Inc.,* 804 F.2d 1418, 1426 (9th Cir.1986) (emphasis in original) (in the process of concluding that Hawaii would follow § 552B of the Restatement and award only out-of-pocket damages in negligent misrepresentation cases). We agree with the distinction between out-of-pocket and benefit-of-the-bargain damages represented by *Gediman* and pointed out explicitly in *Cunha.* In our opinion, *Lewis* also is consistent with this distinction, falling comfortably within the rubric of out-of-pocket loss as defined in §§ 549(1)(b) and 552B(1)(b), although our colleagues on the Eighth Circuit have characterized the *Lewis* case as a "narrow exception to the out-of-pocket damage rule" applicable "where the recovery of out-of-pocket expenditures would not return the injured party to the position it was in but for the misrepresentation." *W.K.T. Distributing,* 746 F.2d at 1337. In *Lewis,* the defendant agent negligently represented to the plaintiff that her husband had earlier purchased a life insurance policy when he actually had purchased an annuity. When he died, the plaintiff tried to redeem the policy only to find out its true nature. Rather than simply awarding plaintiff the return of her husband's premium payments (which were not *her* reliance), the court awarded damages in the amount of the death benefit of the non-existent insurance policy because plaintiff forewent purchasing alternative or additional insurance on the basis of defendant's misrepresentations. In one sense, measuring plaintiff's recovery by what she had been assured existed seems to award her the benefit of a hypothetical bargain to buy life insurance. But, in fact, the misrepresentation in *Lewis* did not lead the plaintiff into a bargain which she sought to enforce. Rather, the misrepresentation caused her to forego something valuable, which, happenstantially, was a "bargain". *Its* benefit is not what § 552B(2) bars from recovery. § 552B(2) only directs that a plaintiff is not entitled to recover for expectancy created by the defendant's negligent misrepresentations—i.e., the benefit of a negligently described and induced bargain. But while expectations negligently created are not recoverable, benefits foregone as a result of such expectations are. Illustrations from the Restatement make clear that reliance is recoverable and expectancy is not; but reliance is fully recoverable even when it matches expectancy. *Compare* § 549, Illustration 1 (illustrating out-of-pocket or reliance damages under Clause (1)(b)) *with* § 549, Illustration 8 (illustrating benefit-of-the-bargain damages under Clause (2)). The *Lewis* court simply and appropriately awarded the "pecuniary loss suffered ... as a consequence of the recipient's reliance upon the misrepresentation;" namely, the value of a valid life insurance policy that she would have acquired had the defendant not made her think that she possessed one already.

■ In deciding whether the jury awarded out-of-pocket or benefit-of-the-bargain damages, we begin by focusing on the key distinction between these two measures of damages, which, as evidenced by the above discussion, we believe is concisely summarized as the difference between reliance and expectancy damages. The limitation on benefit-of-the-bargain damages refers to the expectancy damages caused where a misrepresentation underlies a bargain. In other words, benefit-of-the-bargain damages arise only where the misrepresentation created an expectancy. The plaintiff is not entitled to recover the expectancy described or contemplated by the misrepresentation because it was not a real loss suffered. Here, by contrast, no bargain was induced by the misrepresentation—Trytko had long before received the stock options in exchange for services to the company.[5] They were already his valuable property which he would not have let lapse into valuelessness if not for the misrepresentation. In essence, Hubbell maintains that because Trytko's property (the options) was acquired in a past bargain, any compensation for impairment to that property caused by a later negligent misrepresentation would afford Trytko the benefit of his bargain. While this is true as such, Hubbell's argument goes far beyond the limitation of (and justifications for) benefit-of-the-bargain damages as set out and illustrated in the Restatement. In reliance on Davies' misrepresentation, Trytko forbore from exercising a valuable contract right he already possessed prior to the misrepresentation, and, following the Restatement, he is entitled to recover the pecuniary loss suffered as a consequence of that misrepresentation. The jury award followed the instructions, which adequately stated the Restatement's position on damages, see infra section II.D., and awarded only reliance losses reflecting a determination that Trytko would have exercised his options within the allotted period, thereby acquiring 9,500 shares of Hubbell stock by June 1, 1988, and subsequently would have held onto that stock.[6] By virtue of Hubbell's later stock dividends, Trytko's ownership of Hubbell would have increased to 11,547 shares by the date of trial, having a market value of approximately $629,300. This amount, however, overcompensates Trytko because it does not take into account the option price of $95,000, a sum which Trytko would have had to pay under this scenario. The judgment should be reduced accordingly.

## C.

■ Next we turn to Hubbell's objections to the district court's evidentiary rulings, which we review for an abuse of discretion. United States v. Flores, 5 F.3d 1070, 1080 (7th Cir.1993), cert. denied, — U.S. —, 114 S.Ct. 884, 127 L.Ed.2d 79 (1994). The court admitted into evidence numerous notices sent by Hubbell to remind stock option holders of impending deadlines, as well as extensive oral testimony from Davies explaining the notices. Hubbell admits that it began sending these notices prior to the expiration date of Trytko's options and that Trytko did not receive one.

At trial and on appeal, Hubbell contends that the notices constituted "subsequent remedial measures" and were inadmissible under Fed.R.Evid. 407.[7] In denying Hubbell's

---

5. Hubbell argues that Trytko suffered no out-of-pocket loss in reliance on Davies' statements because he neither paid for the options in the first place nor paid anything to exercise them later. This argument is unconvincing. Surely Hubbell did not extend the options as outright gifts to Trytko; rather, they constituted a component of his compensation package for which he gave valuable consideration through his continuing services to the company.

6. We need not decide whether Indiana would adopt the traditional view embodied in the Restatement or a more expansive view allowing benefit-of-the-bargain damages for negligent misrepresentation because the jury award was cor-

rect (with a modification) even under the more restrictive approach.

7. Rule 407 states as follows:

When, after an event, measures are taken which, if taken previously would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

post-trial motions, the district court noted that "the proffered evidence now challenged under Rule 407 was offered to impeach Richard Davies and for that reason alone was admissible even when challenged under Rule 407." Mem. Order at 7 (Feb. 22, 1993). In addition to repeating the court's rationale, Trytko asserts that Rule 407, by its very terms, does not apply to the contested evidence because the event which triggered Hubbell's practice of sending the notices involved a different option holder. Moreover, Trytko contends that Rule 407 only excludes measures that are both subsequent *and* remedial; therefore, he argues, evidence of a practice begun five months *before* his claim arose should be admissible.

We need not address the merits of Trytko's alternative arguments because we agree with the district court that, at the very least, the evidence was admissible for the purpose of impeaching Davies' testimony that the language of the post-retirement deadlines for the exercise of stock options was "simple and straight-forward." There was no abuse of discretion in admitting the evidence, and the burden of requesting a limiting instruction, if indeed one would have been appropriate, rested with Hubbell. Hubbell declined to exercise this opportunity, and having done so, has waived any objection on that score. *United States v. Murzyn*, 631 F.2d 525, 531 (7th Cir.1980), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981).

### D.

▮▮▮▮ Hubbell asserts that the district court erred in giving Jury Instructions 17, 18, 19, and 23, and in failing to give Hubbell's proposed Instruction 15A. In general, appel-

late review of jury instructions is limited, and we will reverse only if the instruction misguides the jury to a litigant's prejudice. *Doe v. Burnham*, 6 F.3d 476, 479 (7th Cir.1993). When reviewing the adequacy of jury instructions, we "construe them in their entirety and not in artificial isolation," *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1117 (7th Cir.1983), to determine if "the instructions as a whole were sufficient to inform the jury correctly of the applicable law." *United States v. Villarreal*, 977 F.2d 1077, 1079 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993). Of course, Indiana law controls the propriety of contested jury instructions. *Superbird Farms, Inc. v. Perdue Farms, Inc.*, 970 F.2d 238, 245 (7th Cir.1992) (citations omitted). Under Indiana law, the trial court must give an instruction if the instruction is supported by the evidence. *Id.* (citing *Weller v. Mack Trucks, Inc.*, 570 N.E.2d 1341, 1343 (Ind.App. 1st Dist.1991)). As a threshold matter, however, a party may not contest a district court's refusal to use a proposed instruction if that instruction does not correctly state the law. *Northbrook Excess & Surplus v. Procter & Gamble*, 924 F.2d 633, 638 (7th Cir.1991).

Instructions 17, 18, and 19 addressed Trytko's theory of negligent misrepresentation. Hubbell's argument against these instructions thus is inextricably intertwined with its contention that Indiana does not recognize the tort of negligent misrepresentation. Because we find that Indiana, in fact, does recognize that tort, we affirm the district court's decision to convey instructions explaining that theory to the jury.

▮▮▮▮ Instruction 23 [8] and proposed In-

---

8. Instruction 23 stated as follows:

The damages for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to that plaintiff of which the misrepresentation is a legal cause including the difference between the value of what the plaintiff has received in the transaction and its purchase price or other value given for it and the pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

Pecuniary loss is defined as a loss of money or something of monetary value.

You are instructed that a plaintiff is required by law to take reasonable steps to mitigate or reduce his damages, if any. If under the facts presented by the evidence in this case you find that plaintiff sustained damages but failed to take reasonable steps to mitigate or reduce those damages, this is a factor you are to consider in awarding any damages to plaintiff.

The fact that this court gives an instruction on the subject of damages does not infer that this court does or does not believe that a damage award should be made. You, the jury, must make that determination based on the evidence and the law. The instruction is given

struction 15A.[9] relate to the court's charge to the jury on the measure of damages. As indicated by our discussion in section II.B., *supra*, we are well apprised of the difficulty faced by the parties and the district court in formulating jury instructions on the issue of damages in the absence of any Indiana cases on point. The parties could not simply recite boilerplate language, append an Indiana citation to it, and argue persuasively that the jury should be instructed accordingly. Instead, the parties drew upon cases from other jurisdictions and relevant sections of the Restatement in attempting to cobble together an instruction encompassing what an Indiana court probably would do in the circumstances of this case. In so doing, the parties' dispute over the damages instruction, at its core, amounted to a disagreement on how Indiana courts would define the term "benefit of the contract." Hubbell asserts that the definition incorporated in the final paragraph of Instruction 23 was inadequate because it did not tell the jury what "benefit of the contract" means in view of the Restatement § 552B(2) limitations on the recovery of damages. We find this argument unavailing. The jury instruction properly highlighted the relationship between benefit-of-the-bargain damages and a plaintiff's expectancy interest. Based on our view of how an Indiana court would approach this case, *see* section II.B., *supra*, we conclude that the district court's instructions on the damages

issue "were sufficient to inform the jury correctly of the applicable law." *Villarreal*, 977 F.2d at 1079. Moreover, we find that Hubbell's proposed Instruction 15A does not accurately state the law of damages in a negligent misrepresentation case in that it too narrowly confines the scope of available damages.

## E.

■ Hubbell next asks us to overturn the jury's express finding that Trytko was not partially at fault. The gist of Hubbell's argument is that person of Trytko's education, intelligence, and experience must have clearly understood the terms of his stock options and, following from this, must bear at least some measure of fault for failing to exercise them in a timely fashion. Indeed, Hubbell contends that Trytko even "acknowledges that he was partially at fault" in a 1989 letter to Davies.[10]

■ This argument need not detain us long. It is not this court's role to resolve conflicts in testimony or weigh and evaluate the evidence; these tasks are reserved for the factfinder—here a jury—whose decision we will not upset "[i]f the evidence, taken as a whole, provides a sufficient probative basis upon which [it] could reasonably reach a verdict, without speculation over legally un-

for your guidance if, and only if, you decide to award damages.

You are instructed that a contract is a promise or a set of promises for the breach of which the law gives a remedy or the performance of which the law in some way recognizes as a duty.

Benefits of a contract are based on an injured party's expectation interests and are intended to give him the benefit of the bargain by awarding a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.

9. Proposed Instruction 15A stated:

In the event you find that plaintiff is entitled to recover in this action, you are instructed that such recovery must be confined to damages proven by a preponderance of the evidence to have been incurred in reliance on defendant's misrepresentations, if any, and do not include any damages claimed for loss of the benefit of plaintiff's contracts with defen-

dant, including loss of his stock option contracts, the difference in the market value of defendant's common stock had plaintiff exercised his options as required by those contracts, and the price he would have been required to pay had he done so, and the value of any stock splits and dividends he would have received had he exercised such options in a timely manner.

10. That letter read in relevant part:

Dear Rick:
I have reviewed your letters of December 15, 1988 and January 12, 1989 and find the position of the Company in denying my rights as an optionee and retiree of Hubbell, Inc. very disturbing. I am left with the impression that the "mistake" in not exercising my stock options by June 1, 1988 was the result of misunderstanding on my part alone, and, in no way, influenced by our meeting on March 19, 1985 or the omission of a confirming letter from you covering this meeting. . . .

founded claims." *Cygnar v. City of Chicago*, 865 F.2d 827, 834 (7th Cir.1989). At trial, the jury heard extensive evidence as to what the relevant parties said and understood about the exercise of the options and whether the terms of the option contracts were indeed easy to understand. Furthermore, Hubbell's argument that Trytko in some way admitted partial fault is misplaced. When read in its proper context, the reference to a "mistake" in Trytko's letter does not seem to be an admission on his part, but rather a restatement of his interpretation of Hubbell's position on the matter. The jury had ample basis for assigning no fault to Trytko and we will not reweigh the evidence to test whether we would arrive at exactly the same figure.

### F.

In addition, Hubbell asserts that the district court erroneously curbed the scope of its closing argument with respect to mitigation of damages. Though the court instructed the jury on the duty to mitigate damages, it sustained an objection to Hubbell's attempt to argue that Trytko could have purchased shares on the open market soon after learning that Hubbell would not permit the exercise of the stock options. Hubbell maintains that ample evidence in the record supported an inference that Trytko had the financial capacity to acquire some, if not all, of the shares he wished to purchase, and that Trytko's failure to do so should result in a reduction of damages.

 A district court has considerable discretion in supervising the arguments of counsel, and we will reverse a verdict only where the court has abused that discretion. *Moylan v. Meadow Club, Inc.*, 979 F.2d 1246, 1251 (7th Cir.1992). Though the scope of closing argument is broad, counsel may not

make reference to matters not in evidence. *See e.g., Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 860 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Musgrave v. Union Carbide Corp.*, 493 F.2d 224, 231 (7th Cir.1974). The line of argument to which Trytko's counsel objected pertained to the extent to which Trytko could have purchased Hubbell stock the day after he learned that Hubbell would not honor his options.[11] The trial judge properly sustained the objection because Hubbell had failed during the trial to present any evidence of Trytko's ability to mitigate potential damages as of December 5, 1988. To be sure, six months after discovery closed and two weeks before trial Hubbell belatedly attempted to obtain information regarding Trytko's financial status at that time, but was prevented from doing so when a magistrate granted Trytko's Motion to Quash a Subpoena for Production of Documents. The district court did not err in preventing Hubbell's counsel from discussing Trytko's financial condition as of December 5, 1988, because such information was not admitted into evidence at trial.[12]

### G.

 Finally, we briefly review Hubbell's claim that the damage award was excessive and contrary to the law and evidence. Even in a diversity case, we review this issue under a federal standard: namely, we may disturb a jury's damage award only if it is monstrously excessive, the product of passion and prejudice, or if there is no rational connection between the award and the evidence. *Superbird Farms*, 970 F.2d at 247. In this case, there is absolutely no evidence that the jury was driven by passion or prejudice, nor was the award "monstrously excessive."

---

**11.** The relevant dialogue went as follows:

MR. YODER: Now, in terms of mitigation, if Mr. Trytko, as soon as he found out that Hubbell was not going to permit him to exercise his stock options, if he had gone out in the open market, let's say, the day after December 5th, 1988, he could have purchased—
MR. BRUNNER: Objection, Your Honor. I am reluctant to object and interrupt counsel in final argument, but there was no evidence as to what Mr. Trytko—

THE COURT: I will sustain your objection. Tr. Trans. at 626.

**12.** We note, however, that even without evidence of Trytko's financial condition as of December 1988, the jury instruction on the duty to mitigate was not superfluous because the jury knew that Trytko earned in the neighborhood of $100,000 in his final year at Raco and that he had been able to raise $70,000 in order to exercise stock options in 1985.

Nevertheless, as we noted in section II.B., *supra*, the damage award should have been reduced by the option price—$95,000—because Trytko would have had to part with that sum whenever he exercised his options and allowing him to keep it would result in a windfall.

### III.

■ The only issue remaining is whether the district court erred in granting judgment as a matter of law against Trytko on his claim for constructive fraud. We review directed verdicts under a *de novo* standard, *Deimer v. Cincinnati Sub–Zero Products, Inc.*, 990 F.2d 342, 344 (7th Cir.1993), and in diversity cases, we apply the state standard for granting such a motion. *Id.; Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1393 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992). Under Indiana law,

> When the trial court considers a motion for judgment on the evidence, it must view the evidence in a light most favorable to the non-moving party. Judgment may be entered only if there is no substantial evidence or reasonable inference to be drawn therefrom to support an essential element of the claim.

*First Fed. Sav. Bank v. Galvin*, 616 N.E.2d 1048, 1051 (Ind.App. 5th Dist.1993) (citations omitted).

■ Constructive fraud is an equitable theory of relief, the elements of which are: (1) the existence of a duty due to a relationship between the parties; (2) violation of the duty by making deceptive material representations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate cause thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Knauf Fiber Glass, GmbH v. Stein*, 615 N.E.2d 115, 124 (Ind.App. 5th Dist.1993) (citing *McDaniel v. Shepherd*, 577 N.E.2d 239, 242 (Ind. App. 4th Dist.1991)), *aff'd in part and vacated in part on other grounds*, 622 N.E.2d 163 (Ind.1993); *see also McWaters v. Parker*, 995 F.2d 1366, 1372 (7th Cir.1993) (noting the elements of constructive fraud in Indiana). Trytko contends that he has proved each of these elements with substantial probative evidence.

■ At oral argument, Hubbell and Trytko agreed that the tort of constructive fraud differs from the tort of negligent misrepresentation in that the former requires two additional elements: (1) the existence of a confidential relationship, and (2) the gaining of an advantage by one party at the expense of the other. However, the parties disputed the extent of the advantage required to satisfy that element of the tort. Hubbell contends that Indiana law demands an "unconscionable" advantage. Trytko insists that Indiana courts have abandoned such a requirement, which he characterizes as merely semantic, but adds nevertheless that under any standard Hubbell "obtained an advantage that the law cannot condone." Cross–App.Rep.Br. at 5.

We find that in the circumstances presented here, Indiana courts would require Trytko to demonstrate that Hubbell gained an "unconscionable" advantage by virtue of its conduct with respect to the stock options. Though the boilerplate recitations of the elements of constructive fraud have not explicitly incorporated the term "unconscionable", recent Indiana cases, including those cited in Trytko's brief, have indicated the continued vitality of such a requirement. For example, in *Knauf Fiber Glass*, the court stated that "[c]onstructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an *unconscionable* advantage, irrespective of actual intent to defraud." 615 N.E.2d at 124 (citing *McDaniel*, 577 N.E.2d at 242 and *Paramo v. Edwards*, 563 N.E.2d 595, 598 (Ind.1990)) (emphasis supplied). Likewise, in *Scott v. Bodor, Inc.*, the court noted two bases for constructive fraud, one of which involved buyer-seller relationships not present in the instant case and the other which occurs when "one party takes *unconscionable* advantage of his dominant position in a confidential or fiduciary relationship." 571 N.E.2d 313, 324 (Ind.App. 5th Dist.1991) (emphasis supplied). Finally, in the *Eby* case upon which Trytko

heavily relied to show that Indiana recognizes the tort of negligent representation, the court distinguished actual fraud from constructive fraud, noting that the latter "provides a remedy on more equitable grounds by refusing to sanction behavior which procures an *unconscionable* advantage to one party over another regardless of the intent." 455 N.E.2d at 628 (citations omitted) (emphasis supplied).

Hubbell argues that it gained no advantage from the expiration of Trytko's unexercised stock options. Trytko counters that Hubbell avoided at least a paper loss of approximately $450,000 by retaining the stock, presumably for sale at its full market price, rather than selling it to Trytko at the vastly discounted option price. Trytko further contends that the stock options induced Trytko to remain employed at Raco for an additional four years, each of which were profitable for Hubbell. Though we agree that the unexercised options redounded somewhat to Hubbell's benefit, we cannot say that the reasonable inferences to be drawn from Davies' conduct could support a finding of the type of unconscionable advantage that Indiana courts have recognized as actionable under the tort of constructive fraud. In other words, this is not a situation "so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent." *Scott*, 571 N.E.2d at 324. Accordingly, we affirm the district court's decision to grant judgment as a matter of law for Hubbell on Count II of Trytko's Amended Complaint.

### IV.

Federal courts exercising diversity jurisdiction often must predict what a state court would decide on the basis of conflicting signals, or no signals at all, from the highest courts of that state. This is such a case. After thoroughly parsing the relevant cases, we conclude that Indiana recognizes the tort of negligent misrepresentation and would allow a successful plaintiff to recover the out-of-pocket or reliance damages suffered as a consequence of the defendant's deception. Therefore, the jury verdict in favor of Trytko on Count I is affirmed, but the amount of

damages is reduced by $95,000 (from $629,300 to $534,300) to reflect the price Trytko would have paid had he exercised his stock options. With respect to the cross-appeal, we affirm the district court's entry of judgment as a matter of law against Trytko because Hubbell did not gain the type of unconscionable advantage that Indiana courts have required under the tort of constructive fraud. The judgment of the district court is

AFFIRMED AS MODIFIED.